CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
6/19/20
JULIA C. DUDLEY, CLERK
BY: K. Dotson
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                        ) | Criminal No.: 3:20cr00014 |
| ) | |
| DANIEL KINCHELOE          ) | |
| ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations contained in the Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of these facts beyond a reasonable doubt.

DANIEL KINCHELOE was an active member of the Virginia bar whose office was located in Richmond, Virginia. Timothy Litzenburg was an active member of the Virginia bar whose office was located in Charlottesville, Virginia. Starting in or around 2018, KINCHELOE and Litzenburg formed a law firm specializing in representing plaintiffs in mass torts litigation.

As partners, KINCHELOE and Litzenburg represented plaintiffs who alleged that the weed-killer sold under the brand name Roundup caused cancer in Roundup users. By the fall of 2019, KINCHELOE and Litzenburg had been engaged by hundreds of clients to represent them as plaintiffs in litigation related to Roundup.

Company 1 was a chemicals manufacturer, with facilities located all over the world. Company 2 was a publicly traded U.S. corporation listed on the NASDAQ exchange. In or around 2018, Company 2 acquired Company 1.

In or around early September 2019, Litzenburg, with KINCHELOE's agreement and knowledge, transmitted to Company 1 a draft complaint ("Draft Complaint") on behalf of Person 1, whom KINCHELOE and Litzenburg represented. The Draft Complaint alleged that Company 1 and other related companies were responsible for several chemical compounds used in Roundup, and that certain of those chemicals caused cancer in Roundup users. Among other things, the Draft Complaint alleged that Company 1 knew of the carcinogenic properties of these chemicals but failed to warn Roundup users and others exposed to Roundup about such risks.

After receiving the Draft Complaint, Attorney 1 and Attorney 2 began representing Company 1 as Company 1's counsel in discussions with Litzenburg and KINCHELOE.

*Defendant's Initials:* DnK

On or about October 16, 2019, Litzenburg, KINCHELOE, and Attorney 1 participated in a telephone call while Attorney 1 was outside the Commonwealth of Virginia. In sum and substance, Litzenburg stated during the call that he still intended to file the Draft Complaint, unless a resolution could be found. Litzenburg also indicated that if he did file a public lawsuit, other lawsuits would likely follow as the public became aware of Company 1's role. After describing the possibility of the lawsuits against Company 1, Litzenburg proposed, in sum and substance, that he and KINCHELOE could enter into a "consulting arrangement" with Company 1. Doing so, Litzenburg stated, would create a purported conflict-of-interest that would effectively stop him from representing plaintiffs in litigation against Company 1. After the October 16, 2019 call, Litzenburg, with KINCHELOE'S knowledge and agreement, demanded that Company 1 pay Litzenburg, KINCHELOE, and others, a total of $200 million in purported "consulting fees."

On or about October 21, 2019, KINCHELOE registered Golden Ratio, LLC as a Virginia corporation. KINCHELOE and Litzenburg agreed together to create Golden Ratio, LLC for the purpose of receiving monies from Company 1, which KINCHELOE and Litzenburg agreed to split amongst themselves and their associates. KINCHELOE and Litzenburg agreed that they would not distribute any of the monies Company 1 paid them as purported "consulting fees" to their existing clients. KINCHELOE and Litzenburg further agreed that they would each take $50 million of the $200 million in total payments from Company 1 for themselves, with the remainder paid to two other associates.

On or about October 24, 2019, Litzenburg sent an email to Attorney 1 while Attorney 1 was outside the Commonwealth of Virginia. In the email, which KINCHELOE helped draft, Litzenburg made threats to injure the property and reputation of Company 1 and Company 2 unless Litzenburg, KINCHELOE, and others were paid $200 million pursuant to purported "consulting arrangements." If the $200 million was not paid, Litzenburg threatened in the email that Litzenburg, KINCHELOE, and others would commence litigation that would become "an ongoing and exponentially growing problem for [Company 1], particularly when the media inevitably takes notice." Litzenburg further threatened in the email that such litigation would cost Company 1 and Company 2 "billions, setting aside the associated drop in stock price and reputation damage."

On or about November 6, 2019, Litzenburg sent an email to Attorney 1 and Attorney 2, copying KINCHELOE, while both Attorney 1 and Attorney 2 were outside the Commonwealth of Virginia. In the email, Litzenburg made threats to injure the property and reputation of Company 1 and Company 2 unless Litzenburg, KINCHELOE, and others were paid the $200 million pursuant to purported "consulting arrangements." Litzenburg claimed in the email that he had a "list of 1000ish Roundup clients" and threatened that unless Litzenburg, KINCHELOE, and others were paid the $200 million, Company 1 would have "thousands of future plaintiffs against [Company 1]." Litzenburg concluded the email in part by threatening, "That is another thing I can guarantee and warrant: in the absence of a so-called 'global' or final deal with me, this will

*Defendant's Initials:* DAK

certainly balloon into an existential threat to [Company 1]."

On or about November 12, 2019, Litzenburg and KINCHELOE met in person with Attorney 1 and Attorney 2 at a conference center in Charlottesville, Virginia. During the meeting, Litzenburg again threatened to injure the property and reputation of Company 1 and Company 2 unless Litzenburg, KINCHELOE, and others were paid $200 million pursuant to purported "consulting arrangements." Litzenburg said in part: "what's certain . . . is that if we walk out of here today without a deal, and we, uh, you know, the [Person 1] case gets filed and gets served. And we've talked about the consequences." Litzenburg also stated that if Litzenburg, KINCHELOE, and others commenced litigation against Company 1, there was no way Company 1 "gets out of it for less" than "[a] billion. Yeah. No, I mean, nuisance value, uh, defense lawyer fees, a hit in the stock when this gets filed and served, maybe the press conference, whatever." Litzenburg also stated, "[W]e can be, um, your biggest problem. Right now we're your only problem or potential problem." Later on, Litzenburg again stated, in sum and in part, if Litzenburg, KINCHELOE, and others commenced litigation it would have adverse effects on Company 2's stock price, which Litzenburg described as "a 40% stock loss coming off the top." Litzenburg also stated to Attorney 1 and Attorney 2, "We walk out of here today, and you're telling them [Company 1], you know, 'You are absolutely, absolutely making a quarter of a million, 500 million, billion plus dollar investment in a public relations nightmare.'" Later on during the meeting, Attorney 2 asked what entity would serve as the entity to which the $200 million would be paid to Litzenburg, KINCHELOE, and others. KINCHELOE responded that the money should be paid to "Golden Ratio LLC," the same entity that KINCHELOE and Litzenburg had previously agreed would receive any movies paid by Company 1 and Company 2, and which KINCHELOE had registered as a Virginia corporation.

In performing the above actions, KINCHELOE agreed with Litzenburg to extort money from Company 1 and Company 2, and aided and abetted Litzenburg in extorting money from Company 1 and Company 2. Further, in demanding $200 million from Company 1 and Company 2, KINCHELOE did not believe that either he or Litzenburg had a valid claim of right to a $200 million payment from either Company 1 or Company 2.

The actions taken by KINCHELOE, as described above, were taken willfully, knowingly, and with the specific intent to extort money from Company 1 and Company 2. KINCHELOE acknowledges that the purpose of the foregoing statement of facts is to provide an independent factual basis for his guilty plea. It does not necessarily identify all of the persons with whom the defendant might have engaged in illegal activity, nor does it necessarily identify all of the facts known to KINCHELOE concerning illegal activity in which he or others may have engaged.

Respectfully submitted,

*Defendant's Initials:* DMC

*[signature]*

L. Rush Atkinson
Assistant Chief, Fraud Section

Henry P. Van Dyck
Principal Assistant Chief, Fraud Section

After consulting with my attorney and pursuant to the plea agreement entered into this day, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*[signature]*

Daniel Kincheloe, Defendant

I am Daniel Kincheloe's attorney.   I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

*[signature]*

Bill Dinkin, Esquire
Counsel for Defendant

*Defendant's Initials:* ___DnK___